UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| CALUMET SHREVEPORT REFINING, LLC, | |
| Plaintiff, | Civil Action No. 21-00144 |
| v. | Judge S. Maurice Hicks, Jr |
| MICHAEL S. REGAN, in his official capacity as the Administrator of the United States Environmental Protection Agency. | Magistrate Judge Mark L. Hornsby |
| Defendant. | |

**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT
FOR INJUNCTIVE RELIEF**

Plaintiff Calumet Shreveport Refining, LLC ("Calumet") brings this action against EPA Administrator Regan to (1) enjoin enforcement of the Renewable Fuel Standard program with respect to Calumet's Shreveport, Louisiana refinery, and (2) to toll any penalties for non-compliance with the Renewable Fuel Standard program. Calumet files this amended and supplemental complaint pursuant to Federal Rule of Civil Procedure 15(a)(2) and 15(d); EPA's written consent, ECF No. 19 at 2–3; and this Court's November 1, 2021 order, ECF No. 20. Calumet alleges the following facts and claims for relief:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff Calumet Shreveport Refining, LLC, owns a petroleum refinery in Shreveport, Louisiana.

2. Defendant Michael S. Regan is the Administrator of the United States Environmental Protection Agency ("EPA").

3. EPA is an agency of the federal government located in Washington, D.C.

4. This action arises under the Administrative Procedure Act, 5 U.S.C. § 706, and the Clean Air Act, 42 U.S.C. § 7545(o). This Court has jurisdiction under 28 U.S.C. § 1331. Injunctive relief is sought as authorized in 28 U.S.C. § 2202.

5. Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1). Defendant is a United States officer sued in his official capacity. Venue is proper under § 1391(e)(1)(C) because Calumet resides in this district and no real property is involved in the action. Calumet is a resident of Shreveport, Louisiana. Venue is also proper under § 1391(e)(1)(B) because a substantial part of the events or omissions giving rise to the claims occurred in this district, the effects and burdens of the Administrator's actions arise from this district, and the small refinery that is the subject of the action is situated here.

## BACKGROUND

### The Renewable Fuel Standard Program

6. Congress created the Renewable Fuel Standard ("RFS") Program—codified at Clean Air Act Section 211(o), 42 U.S.C. § 7545(o)—as part of the Energy Policy Act of 2005. Pub. L. No. 109-58, § 1501(a), 119 Stat. 594, 1067-74 (2005). The RFS Program requires renewable fuels, such as ethanol and biodiesel, to be blended into petroleum-based transportation fuels (gasoline and diesel) sold in the United States. Congress set annual volumes for nationwide renewable fuel use from 2006 through 2012. *Id.* at 1069. In the Energy Independence and Security Act of 2007, Congress increased the annual renewable fuel volume requirements and extended the RFS Program. Pub. L. No. 110-140, § 202, 121 Stat. 1492, 1521-28 (2007).

7. "Obligated parties" are responsible for ensuring that the volume targets are met each year. 42 U.S.C. § 7545(o)(3)(B)(ii)(I); 40 C.F.R. §§ 80.1406, 80.1407. An obligated party

must meet its Renewable Volume Obligation ("RVO") each year. 40 C.F.R. § 80.1406(b). The statute defines "obligated parties" as "refineries, blenders, distributors, and importers," *see* 42 U.S.C. § 7545(o)(2)(A)(iii)(I), (o)(3)(B)(ii)(I), but EPA has imposed compliance obligations solely on refiners and importers, *see* 40 C.F.R. § 80.1406(a)(1). To calculate its RVO, an obligated party multiplies EPA's volume percentage for the year by the volume of transportation fuel the company produced or imported.

### Renewable Identification Numbers (RINs)

8. Obligated parties demonstrate RFS compliance by securing blending credits called Renewable Identification Numbers ("RINs"). *Id*. § 80.1427. A RIN is created when a renewable fuel producer manufactures renewable fuel—ethanol, for example. *Id*. § 80.1426. Until the renewable fuel is blended into petroleum-based transportation fuel, the RIN remains attached to the physical volume of renewable fuel. *Id*. § 80.1428. The RIN is "separated" when the renewable fuel is blended into transportation fuel. *Id.* § 80.1429. Obligated parties use separated RINs to demonstrate RFS compliance. *Id*. § 80.1427.

9. Obligated parties that do not separate enough RINs to meet their RVOs through blending must buy RINs in the secondary market. "Many obligated parties"—particularly small refineries—"do not have access to renewable fuels or the ability to blend them, and so must use credits to comply." 72 Fed. Reg. 23,900, 23,904 (May 1, 2007). Under the system established by EPA, RINs can be traded on a spot market or bought and sold through private contracts. 75 Fed. Reg. 14,670, 14,722 (Mar. 26, 2010). The RIN market is wholly unregulated.

10. RINs expire after two years; they must be used for compliance for the calendar year in which they are separated or the following calendar year. 40 C.F.R. § 80.1428(c).

11. An obligated party can use up to 20 percent of the prior year's RINs toward compliance for the current year. *Id.* § 80.1427(a)(5).

12. An obligated party can carry over a deficit to the next compliance year if it cannot generate or buy enough RINs, 72 Fed. Reg. at 23,904, 23,909, 23,935, but must then make up that deficit and meet its annual obligation the following year, *id.* at 23,909. An obligated party cannot carry a deficit two years in a row. *Id.* at 23,914, 23,935.

13. At the outset of the RFS Program, RINs traded for near their intrinsic value—about two cents. As the annual volume requirements have increased, the price of RINs has skyrocketed by as much as 5,000%. RINs are currently trading at near record highs.

### The Small Refinery Exemption

14. When Congress created the RFS Program, it instructed the Department of Energy to study the impact RFS compliance would have on "small refineries"—those which produce an average of 75,000 barrels or fewer per day. In its report to Congress in 2011 ("DOE Study"), the Department of Energy concluded that small refineries like Calumet would face disproportionate economic hardship as the annual volume mandates increase and the price of RINs increases.

15. The DOE Study found that small refineries would face disproportionate economic hardship from RFS compliance due to the competitive distortions in favor of blending refineries and exempt (non-refining) blenders. Constructing facilities for blending renewable fuels into petroleum products is capital-intensive and may not be feasible for small refineries, meaning they are forced to purchase RINs from larger refiners or non-obligated parties that operate blending facilities. Small refineries often sell to limited geographic markets, where acceptance of renewable fuel blends is low. Unlike large, vertically integrated refiners that can transport their fuels to different markets, small refineries are forced to limit the extent to which they blend renewable fuels to match what their local markets will accept. As a result, many small refineries are heavily reliant on purchasing RINs to comply with the RFS Program. And when the market price for RINs

exceeds the cost of purchasing and blending renewable fuels, compliance with the RFS Program advantages large refineries and disadvantages non-blending small refineries.

16.     Congress did not intend to place small refineries at a permanent competitive disadvantage relative to large refineries. Indeed, Congress created the RFS Program to promote American energy independence, of which small refineries are a critical part. Small refineries make up 40 percent of domestic refineries and 12 percent of domestic refining capacity. Congress intended to keep small refineries "competitive and profitable." S. Rep. No. 114-281, at 70–71 (2016).

17.     As a result, Congress allowed small refineries to petition EPA for an exemption from annual RFS compliance "for the reason of disproportionate economic hardship." 42 U.S.C. § 7545(o)(9)(B)(i). Congress directed EPA, "in consultation with the Secretary of Energy," to consider the findings of the DOE Study and "other economic factors" when evaluating petitions for small refinery hardship exemptions. *Id.* § 7545(o)(9)(B)(ii).

### Calumet's Hardship Petitions to EPA

18.     Calumet owns a petroleum refinery in Shreveport, Louisiana.

19.     Calumet is an "obligated party" under the RFS Program. 40 C.F.R. § 80.1106(a)(1). As an obligated party, Calumet must blend renewable fuel into the transportation fuel it produces or buy RINs from other parties that have blended renewable fuel into transportation fuel.

20.     Calumet's refinery is a "small refinery" under the RFS Program. 40 C.F.R. § 80.1141(g).

21.     Calumet is unable to sell enough blended fuels to meet its RFS obligations, and it faces increasing compliance costs driven by the high price of RINs.

22.     Small refineries may petition EPA at any time for an exemption from annual RFS compliance based on disproportionate economic hardship. 40 C.F.R. § 80.1441(e)(1).

23. Calumet submitted a petition for small refinery hardship relief for the 2019 compliance year on December 20, 2019. Upon information and belief, EPA received Calumet's 2019 petition on or shortly after December 20, 2019.

24. Calumet submitted a petition for small refinery hardship relief for the 2020 compliance year on December 15, 2020. Upon information and belief, EPA received Calumet's 2020 petition on or shortly after December 15, 2020.

25. Calumet's petitions specifically documented why RFS compliance would cause disproportionate economic hardship and negatively impact Calumet's competitiveness and profitability.

### EPA's Ongoing and Unlawful Delay and the Harm to Calumet

26. Under the Clean Air Act, EPA must act on small refinery exemption petitions within 90 days of receipt. 42 U.S.C. § 7545(o)(9)(B)(iii); 40 C.F.R. § 80.1141 (e)(2) ("The Administrator shall act on such a petition not later than 90 days after the date of receipt of the petition.").

27. EPA should have acted on Calumet's 2019 petition on or shortly after March 19, 2020. EPA should have acted on Calumet's 2020 petition on or shortly after March 15, 2021.

28. As of November 10, 2021, EPA has yet to act on Calumet's exemption petitions, approximately 692 days after receipt of the 2019 petition and 331 days after receipt of the 2020 petition. Thus, EPA is in violation of the Clean Air Act.

29. The Clean Air Act also requires the EPA Administrator to "determine and publish in the Federal Register" the "renewable fuel obligation" by November 30 of the year proceeding the compliance year in question. 42 U.S.C. § 7545(o)(3)(B)(i).

30. Under 40 C.F.R. § 80.1451(a), the deadline to demonstrate RFS compliance is March 31 of the year following the compliance year. Thus, obligated parties have 16 months to plan for and demonstrate compliance between the publication of the annual volume obligation and the deadline for compliance with that obligation.

31. On April 1, 2021, EPA extended the deadline for RFS compliance for small refineries for the 2019 compliance year and extended the compliance deadline for all obligated parties for the 2020 compliance year. *See* Extension of 2019 and 2020 Renewable Fuel Standard Compliance and Attest Engagement Reporting Deadlines, 86 Fed. Reg. 17,073, 17,073–78 (Apr. 1, 2021). The rule sets forth a 2019 RFS compliance deadline of November 30, 2021 for small refineries only, and a 2020 RFS compliance deadline of January 31, 2022 for all obligated parties. *Id*. In extending these deadlines, EPA acknowledged "the importance to obligated parties of planning their compliance for a given calendar year by understanding their obligations for the years before and after," and that small refineries need sufficient lead time for RFS compliance once the RVOs are finalized and hardship exemption decisions are issued.

32. EPA still has not published the renewable fuel volume requirements for the 2021 compliance year, even though EPA was statutorily required to do so by November 30, 2020—almost one year ago. The deadline for 2021 RFS compliance is March 31, 2022—only a few months away. EPA's unlawful and unprecedented delays in publishing the annual volume requirements and in issuing decisions on 2019 and 2020 small refinery hardship exemption petitions has caused uncertainty and scarcity in the RIN market and led to exorbitant RIN prices.

33. Calumet has notified EPA that, if Calumet must comply with the RFS for compliance year 2019, it will carry forward a deficit from 2019 to compliance year 2020. Thus,

absent an exemption, Calumet will have to comply with the RFS for compliance years 2019 and 2020 on January 31, 2022.

34. The cost of RFS compliance is at or near record highs. It has become virtually impossible to obtain 2018- or 2019-vintage RINs. As explained above, an obligated party can use 2018- and 2019-vintage RINs to demonstrate compliance for 2019. *See* 40 C.F.R. § 80.1428(c). All obligated parties other than small refineries were already required to demonstrate compliance for 2019, 40 C.F.R. § 80.1451(a), so they have retired their 2018- and 2019-vintage RINs to comply. As a result, there are no longer any 2018- or 2019-vintage RINs available in the market.

35. All obligated parties must demonstrate compliance with the RFS for 2020 by January 31, 2022, and RIN scarcity has driven up the prices of RINs to at or near all-time highs.

36. It has been widely reported that, on August 26, 2021, EPA sent to the Office of Management and Budget a proposed rule that will lower the 2020 RVOs to deal with the issue of RIN scarcity.[1] Upon information and belief, EPA has delayed issuing the proposed rule for political reasons related to the protracted negotiations over the infrastructure and spending bills. The proposed rule lowering the 2020 RVOs is therefore unlikely to go into effect by the January 31, 2022 compliance deadline. Thus, EPA will effectively be requiring obligated parties to over-comply for compliance year 2020.

37. If EPA does not grant Calumet's hardship petitions in time, or if EPA issues an erroneous denial of Calumet's petitions, then Calumet's total 2019 and 2020 compliance costs for its two facilities in Montana and Louisiana would reach $240.4 million. Calumet simply does not

---

[1] U.S. EPA recommends lowering 2020 biofuel mandates retroactively, Reuters (Aug. 26, 2011), https://www.reuters.com/business/energy/us-epa-sent-annual-biofuel-blending-recommendations-white-house-2021-08-26/; EPA Sends RFS Volumes Proposal to OMB, Progressive Farmer (Aug. 26, 2011), https://www.dtnpf.com/agriculture/web/ag/news/business-inputs/article/2021/08/26/epa-says-volumes-proposal-designed.

have the money to purchase RINs at these exorbitant prices, making it impossible for Calumet to comply with the RFS.

38. Putting small refineries out of business or subjecting them to crippling enforcement penalties runs counter to the purpose of the RFS Program. As noted above, Congress created the RFS to promote American energy independence, of which small refineries are a critical part. Congress intended to keep small refineries like Calumet "competitive and profitable." S. Rep. No. 114-281, at 70–71 (2016).

39. Calumet qualifies for hardship exemptions for RFS compliance years 2019 and 2020, but EPA has yet to issue its decisions, in violation of the statutory deadline.

40. Upon information and belief, EPA continues to delay its decisions on Calumet's and more than two dozen other small refineries' hardship petitions for political reasons related to the protracted negotiations over the infrastructure and spending bills.

41. By its failure to timely grant Calumet's small refinery hardship exemption petitions, EPA would force Calumet to be in violation of the law for failure to comply with the RFS Program if this Court does not enjoin enforcement for the 2019 and 2020 compliance years.

42. If this Court does not enjoin enforcement, Calumet's Shreveport facility could accrue penalties of up to $195,048 per day, in addition to the astronomical cost of compliance, for its inability to comply with the RFS starting on February 1, 2022. *See* 42 U.S.C. § 7545(d)(1); 40 C.F.R. § 19.4.

43. Calumet has another similarly situated facility in Montana, which could bring Calumet's total daily penalty up to $390,096 (nearly $12 million per month) for each violation.[2]

---

[2] The situation at Calumet's Montana refinery is the subject of a similar lawsuit in the Western District of Louisiana. *See Calumet Montana Refin., LLC v. Regan*, No. 21-00007 (D. Mont. filed Jan. 19, 2021).

44. For hardship relief to be effective, EPA must issue decisions on small refinery exemption petitions with significant lead time before the RFS compliance deadline. A small refinery facing a fast-approaching compliance deadline is left with an impossible dilemma: either (a) purchase RINs for compliance (assuming they are available and affordable) and risk not being able to re-sell those RINs if the small refinery receives a last-minute exemption from EPA, or (b) postpone any RIN purchases and risk being RIN-short at the compliance deadline if the small refinery does not receive an exemption from EPA.

45. Had EPA timely and properly granted Calumet's hardship petitions, Calumet would be exempt from the fast-approaching RFS compliance deadlines.

46. Even if EPA had erroneously denied Calumet's hardship petitions but had done so in a timely manner, Calumet would have had more lead time to attempt to plan for compliance, and it would have been able to seek judicial review of EPA's decisions long before the now fast-approaching compliance deadlines. Calumet would have been able to seek judicial review of an erroneous denial by approximately April 2, 2020, for its 2019 petition and by approximately March 29, 2021, for its 2020 petition. 42 U.S.C. § 7607(b)(1); 40 C.F.R. § 23.3.

47. Calumet's interests have been, are being, and will continue to be damaged by the Administrator's failure to comply with the mandatory deadline and his other actions. The Administrator's actions also deprive Calumet of procedural rights and protections to which it is entitled.

48. This Court has the power to enjoin agency enforcement.

49. This Court also has the power to equitably toll statutory penalties.

50. The requested relief would redress Calumet's injuries.

**FIRST CAUSE OF ACTION**

**(Equitable relief for unlawful agency action)**

51. Calumet realleges and incorporates by reference all previous paragraphs.

52. This Court may use its equitable powers to enjoin violations of law by federal agencies when a party is irreparably injured and other legal remedies are inadequate. *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110–11 (1902). "The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (citations omitted). "In cases where administrative misuse of procedure has delayed relief, the courts have the equitable power to order relief tailored to the situation, not mere remand for agency use of its discretion." *Benten v. Kessler*, 799 F. Supp. 281, 283 (E.D.N.Y. 1992).

53. EPA is already in violation of federal law because it has not issued a decision on Calumet's petitions for small refinery hardship relief within 90 days of receipt.

54. As described above, Calumet will be irreparably injured if this Court does not enjoin EPA from enforcing the RFS against Calumet for the 2019 and 2020 compliance years. Complying with the RFS would cost Calumet $240.4 million, which Calumet simply does not have.

55. Not complying with the RFS could cost Calumet Shreveport up to $195,048 per day plus the astronomical cost of compliance, a debilitating penalty that Calumet cannot afford. Calumet has another similarly situated facility in Montana, which could bring Calumet's total daily penalty for each violation up to $390,096 (nearly $12 million per month).

56. Other legal remedies are inadequate as there is currently no relevant final agency action to challenge. EPA has not yet issued decisions on Calumet's hardship exemption petitions. Moreover, if EPA had timely issued grants of Calumet's petitions, Calumet would be exempt from RFS compliance for 2019 and 2020. If EPA had timely issued erroneous denials, Calumet would

have had more lead time to attempt to plan for compliance and the opportunity to seek judicial review of those denials long before the now-approaching compliance deadlines.

## SECOND CAUSE OF ACTION

### (Violation of due process under the Administrative Procedure Act)

57. Calumet realleges and incorporates by reference all previous paragraphs.

58. Under the Administrative Procedure Act, a "court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

59. A party has a due process right to an opportunity to challenge an administrative order. *Brown & Williamson Tobacco Corp. v. Engman*, 527 F.2d 1115, 1119 (2d Cir. 1975).

*60.* That opportunity includes the ability to obtain judicial review of an administrative order "without necessarily having to face ruinous penalties if the suit is lost." *Id.*; *see Okla. Operating Co. v. Love*, 252 U.S. 331, 337 (1920) ("a judicial review beset by such deterrents does not satisfy the constitutional requirements, even if otherwise adequate").

61. As a result, this Court may equitably toll the accrual of penalties where a party has an objective, good-faith basis to challenge the denial of a statutory exemption. *See Brown*, 527 F.2d at 1119; *Solid State Circuits, Inc. v. U.S. Env't Prot. Agency*, 812 F.2d 383, 392 (8th Cir. 1987) (when the parties lacked guidance and the opportunity to challenge an EPA order imposing substantial penalties, EPA would have to show there was no objectively reasonable basis for challenging the order to sustain the daily accrual of fees); *United States v. Charles George Trucking Co.*, 823 F.2d 685, 691 (1st Cir. 1987) (finding many courts have rejected "snowballing" of daily penalties when there are potentially meritorious challenges (collecting cases)).

62. EPA's unlawful and egregious delay has deprived Calumet of the opportunity to challenge EPA's administrative action without facing ruinous consequences. If EPA had decided

Calumet's 2019 petition by approximately March 19, 2020, as statutorily required, Calumet would have had an opportunity to challenge an erroneous denial long before the fast-approaching compliance deadline. Similarly, if EPA had decided Calumet's 2020 petition by March 15, 2021, as statutorily required, Calumet would have had time to challenge an erroneous denial long before the fast-approaching compliance deadline. Calumet has an objective, good faith basis to challenge any denial of its petitions for a small refinery hardship exemption. Now, Calumet is forced to choose between spending $240.4 million it does not have to comply (indeed, over-comply) with the RFS Program, or not complying and accruing up to $390,096 in daily penalties (nearly $12 million per month) for each violation, plus the astronomical cost of compliance.

63. Thus, EPA has violated Calumet's due process rights.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiff respectfully requests that the Court (1) enjoin EPA from requiring Calumet to comply with the RFS for the 2019 and 2020 compliance years and (2) toll all penalties for non-compliance with those RFS obligations, until EPA grants Calumet's petitions for small refinery hardship relief or, in the event that EPA denies one or both of Calumet's petitions, until Calumet obtains a final decision following judicial review of EPA's decisions on Calumet's hardship petitions.

Dated: November 10, 2021    Respectfully submitted:

                                              By:  *s/ Robert Kennedy, Jr.*
                                                  Robert Kennedy, Jr. (#21665)
                                      COOK, YANCEY, KING & GALLOWAY
                                      A Professional Law Corporation
                                      333 Texas Street, Suite 1700
                                      P. O. Box 22260
                                      Shreveport, LA 71120-2260
                                      Telephone: (318) 221-6277
                                      Telecopier: (318) 227-7850

robert.kennedy@cookyancey.com

By: *s/ Jonathan G. Hardin*
    Jonathan G. Hardin (*pro hac vice*)
    LeAnn Johnson Koch (*pro hac vice*)
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: (202) 654-6297
Telecopier: (202) 654-6211
jhardin@perkinscoie.com
leannjohnson@perkinscoie.com

*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

This is to certify that the foregoing was duly served upon the following by the means designated below on the 10th day of November, 2021.

| | |
|---|---|
| **Caitlin McCusker**<br>U S Dept of Justice Env & Natural Resources (7611)<br>P O Box 7611<br>Washington, DC 20044<br>202-514-1950<br>Email: caitlin.mccusker@usdoj.gov<br>*Attorney for Defendant* | ■ CM/ECF |

By: *s/ Jonathan G. Hardin*
Jonathan G. Hardin (*pro hac vice*)